## VINCENT NICOTRA
### vs.
## BIGELOW-SANFORD CARPET CO., ET AL.

Superior Court    Hartford County    File #51475

Present:  Hon. JOHN A. CORNELL, Judge.

J. B. Schatz,                    Attorney for the Plaintiff.

D. L. O'Neill;
E. S. Pomeranz,              Attorneys for the Defendants.

MEMORANDUM FILED JUNE 22, 1936.     122 Conn. 353

CORNELL, J.  The parties here are at odds as to whether claimant's loss of vision to both eyes is the result of an injury suffered to his left eye on November 27, 1933, or due to other causes not arising out of his employment.

Reference to the portions of the transcript certified reveals a considerable amount of medical testimony in substantial

agreement to the effect that atrophy of an optic nerve may result from (1) direct trauma; (2) secondary inflammatory conditions ensuing from trauma to the deeper tissues of the eye-ball, as e.g. interstitial keratitis or oedema; (3) toxic conditions and (4) the use of salvarsan in the treatment of syphilis.

Claimant does not contend that the atrophy of the optic nerve of his left eye was the result of direct trauma (i.e. sufficiently severe to fracture the bony canal in back of the eye through which the optic nerve enters the orbit) nor otherwise such that the injury instantly occurred to the optic nerve or its immediate tissue environs, upon being pierced by a foreign body.

Rather he rests his contentions on the theory that a trauma happened to the deeper tissues of the eye-ball through a very small flake or particle of metal, metal rust or rust dust which either lodged in the cornea or struck there and fell out and set up an inflammatory reaction which ultimately involved and destroyed the function of the optic nerve.

The great volume of medical expert testimony is to the effect that any trauma to the eye-ball sufficiently severe to to cause atrophy of an optic nerve or inflammatory conditions efficient for such purpose, would be visible to a physician examining the eye. The evidence is that at no time, notwithstanding that claimant had continual medical attention, was either any foreign substance or any inflammatory condition discerned by any examining physician in the eye-ball as contradistinguished from the conjunctiva or eye-lid. Nor was there discerned any evidence of scarring such as would remain in the cornea, for example, had hemorrhaging occurred there.

Opposed to the medical expert testimony referred to, supra, is that of another physician who states that in his opinion a very small foreign particle may have imbedded itself in the tissue of the eye-ball in such manner as to have caused mechanical injury to the cornea from which point an irritation was set up which communicated posteriorally to the selera and thence to the optic nerve, the involvement causing an extravasation of lymph from the cerebral spinal fluid into the intra-conjunctival space from which an oedema or some occlusion of the optic nerve resulted; although, as he puts it,

the same result could have ensued from trauma contractu.

Such a foreign substance as this expert has in mind would be so small and so located in the eye tissue that it would not be revealed by opthalmoscopic examination and could only be objectively discovered by X-ray. A trauma such as he envisions whether resulting from an imbedded particle or one which merely penetrated the cornea and instantly bounded off, he seems to indicate would not necessarily leave evidence which could be seen by a physician examining the eye.

It was the duty of the commissioner to find the facts from this conflict of testimony. **Cishowski vs. Clayton Manufacturing Co., 105 Conn. 651, 655, 656; Kosik vs. Manchester Construction Co., 106 Conn. 107.** Insofar as that has been done his conclusions cannot be disturbed.

Examination of the facts upon which the conflicting medical views were based, shows that the history used by the doctor whose testimony was apparently accepted by the commissioner contained a fact which seemingly did not appear in the histories considered by opposing medical experts.

Thus the history used by most, if not all of the other medical experts was that claimant's complaints from the day after the accident to about the time when his loss of vision was discovered was that there was something in his eye which the attending physician had failed to remove and of pain and distress attendant thereupon. The history used by Dr. Carroll, however, is consistently one of complaint of decreased or decreasing vision—of difficulty in seeing—as respects claimant's left eye.

The finding apparently adopts Dr. Carroll's conclusions but the subordinate facts contained therein where definitely stated, are rather those which formed an important part of the history upon which contrary medical expert opinion was based (see paragraph 11). The only reference to difficulty with sight is contained in paragraphs 10 and 15. Neither of these are the equivalent of the facts upon which Dr. Carroll based his opinion. Claimant's testimony is devoid of any statement that he complained to either Dr. Breslin or Dr. Boss of failing vision and the former expressly denies that he did so.

The Commissioner's conclusions, of course, must be tested

by the subordinate facts found by him and no resort can be had to the evidence for this purpose, where there is a lack of such facts in the finding. **Sorrentino vs. Cersosimo, 103 Conn. 426, 429.** It is not enough that a fact be found from a medical opinion. The grounds on which such medical opinion is based, should, also, appear. **Gigleo vs. Dorfman & Kimiavsky, 106 Conn., 401, 410, 411.**

Again, too, while Dr. Carroll's opinion seems to be reasonably definite insofar as it holds that a particle setting up an inflammatory process ultimately involving an optic nerve might be so minute as to escape discovery where, as here, no examination was made by X-ray and that such a presence or entering might leave no evidence which a physician on examination would see, his testimony does not appear equally unequivocal as respects evidence of the inflammation itself. Nor is there anything said in this connection as to when in relation to the day of the accident, on Dr. Carroll's theory, within the realm of reasonable probability such inflammation would have set in and its probable duration.

Considering Dr. Carroll's testimony in the light of that of other experts to the effect that an inflammatory condition sufficient in severity to produce an optic nerve atrophy would be apparent on competent medical examination, this question is certain to enter any future review of the commissioner's ultimate conclusions.

The foregoing has to do with the left eye. The award is predicated upon a finding of total permanent blindness in both eyes. The factual foundation for this is stated in paragraph 17, viz., "Sympathetically, the right eye was affected by the injury to the left eye, so that the net result of the injury is that the claimant is industrially blind in both eyes."

Claimant contends that this is a conclusion drawn from the other facts which appear in the Finding. There is nothing contained in such statements, however, which throws any light upon what basis the conclusion that the right eye was sympathetically affected by the left, proceeds.

There is an amplitude of evidence to the effect that the condition of both of claimant's eyes is the result of syphilis. There is evidence, too, that where syphilis is the cause of optic nerve atrophy it usually affects both eyes and other evidence to the effect that an atrophy of the optic nerve of

one eye is not likely to produce an atrophy of the optic nerve of the other, where the cause of one is trauma or an inflammatory condition ensuing from trauma.

Since the commissioner by his conclusions has rejected the theory that the atrophied optic nerve of the left eye was produced by syphilis he has also rejected syphilis as the cause of the atrophic condition of the nerve of the right eye, because he finds that has resulted from a sympathy with the left.

But not only is there lacking in the subordinate facts found, any support for the conclusion that the condition of the right eye is the result of a sympathetic reaction from that of the left, but there is, also, a total lack of certified evidence upon which to base such a conclusion.

The result is no finding at all that can stand appertaining to the loss of vision of the right eye, and no foundation for the award of compensation for the loss of both eyes.

"The result would be (is) that the conclusion of the commissioner that the death resulted from the injury would be left without a finding of subordinate facts either supporting or controverting it." **McCulloch vs. Pittsburgh Plate Glass Co., 107 Conn. 164, 170.**

"A question of this nature should be presented with the greatest possible care to the end that the commissioner may be able to find with clearness and in sufficient detail, the facts from the medical opinion, together with the grounds upon which the opinion rests." **Gigleo vs. Dorfman & Kimiavsky, 106 Conn. 401, 410, 411.**

See, also, in this connection, **Kenyon vs. Swift Service Co., 121 Conn. 274, 280, 281; Louth vs. The G. & O. Mfg. Co., 104 Conn. 459, 463; Callahan vs. Schollhorn Co., 106 Conn. 211, 215; Kowalski vs. N.Y., N.H. & H. R.R. Co., 114 Conn. 393, 395.**

In view of the disposition of the matter made herein, only such of the corrections of the Finding which seem warranted can be made as will not possibly be involved in any factual conclusions that the commissioner may be called upon to reach. The annexed memorandum entitled "Corrections to Finding" contain these.

It will be observed that none of them touch questions as

to which the commissioner will be required to take further evidence or as to which it will be necessary for him to make additional findings of subordinate facts.

As to the corrections made to paragraphs 5 and 6 of the Finding, it is not believed that the determination of just what took place at the time claimant alleges he was injured can be made to depend upon the nicety with which the choice of words which he selected to describe it, was made.

The corrections made are merely for the purpose of stating occurrence with a little more fidelity to the language used plus certain permissible inferences. The important point, however, is whether the deeper tissues of claimant's eyeball were pierced by some tiny object in a manner which arose out of claimant's employment. Whether that happened because such a particle flew into his eye gently or was catapulted in by the force with which it was detached from the interior surface of the tank, is of no moment if it resulted in a compensable injury.

The corrections made to paragraphs 10 and 12 have only to do with the character of the examinations made by Dr. Breslin and Dr. Boss and the results based upon such examinations, together with the type of complaint made by the claimant to Dr. Breslin and communicated by the latter to Dr. Boss.

As to these latter if the commissioner adheres to his evident conclusion that the complaints of the claimant had to do with the presence of something in his eyeball or pain and discomfort due to that or the fact that the deep tissues were pierced by an object which did not remain in the eyeball, it remains for him to determine whether, there should be added to this a statement that claimant also complained of loss of or failing sight, provided upon a further hearing the evidence justifies such a finding.

Those embodied in paragraphs 13 and 13A are self-explanatory, that to paragraph 14 is believed to be the only conclusion of **fact** as contradistinguished from guess, opinion or speculation permissible under the testimony of Dr. Breslin and Dr. Boss, neither of whom was able to say positively that they had taken the claimant's vision before January 22, 1934, nor to say what its state was prior to that time.

Paragraph 17; and the phrase "because of an industrial in-jury" in the first and second lines of paragraph 19 of the Finding must be stricken out for reasons noted supra. Except as embodied in the corrections made, the reasons of appeal addressed to the Finding are overruled.

The appeal is sustained and the cause remanded to the commissioner for the taking of further evidence and additions of subordinate facts to the Finding as noted in this memorandum.

----

### CORRECTIONS TO FINDING

1. Paragraph 5 of the Finding is corrected to read as follows:

Sometime in the afternoon, the claimant was using the electric brush as a result of which there was a considerable quantity of particles of rust and dirt in the air within the tank. While applying the brush to the ceiling of the tank, one or more particles of rust, rust dust, dust, rust scale or metal particles fell or flew into his left eye.

2. Paragraph 6 of the Finding is corrected to read as follows:

He made complaint to the fellow worker that something had fallen or gotten into his eye, and requested assistance. The other man turned the light on the injured eye, but rendered no aid, complaining that his hands were dirty. He did advise the injured man to go to the plant doctor.

3. Paragraph 7 of the Finding is corrected to read as follows:

Not long after the occurrence and on the same afternoon, the claimant reported to Dr. Breslin, the plant surgeon. The latter examined only the conjunctiva or superficial tissues of claimant's left eye, doing so with the aid of a double magnifying glass which would reveal the smallest object which could be seen in the areas so examined. He found three or four particles of metal rust resting on the inside of the lower lid and some dust along the margin and in the corner of the lid. The doctor made a swab by winding some cotton around an applicator, and with it removed all the foreign matter that he found. From his examination, which was not adapted to re-

vealing any injury to the deeper tissues of the eye, Dr. Breslin observed no irritation inflammation in or evidence of trauma or other abnormal condition in the superficial areas to which his examination applied.

4. The Finding is corrected by adding a paragraph immediately following paragraph 7, to be known as paragraph 7A to read as follows:

On the day following the occurrence, the claimant again called on Dr. Breslin and insisted that there was still something in his left eye whereupon the doctor again made another examination of the same character and scope and limited to the conjunctiva or superficial tissues, and using the double magnifying glass but from such examination discovered nothing and observed no indication of trauma nor irritation or inflammation in the areas examined.

5. Paragraph 8 may be corrected to read as follows:

The claimant returned to see Dr. Breslin at the factory first aid hospital on an average of once or twice per day and persistently complained of pain in his left eye and that that eye was bothering him. Dr. Breslin, however, from such examinations as he made, did not detect the presence of any foreign substance in the eye nor discover any evidence of irritation or inflammation in it. All of the examinations made by Dr. Breslin were conducted with the aid of the double magnifying glass and all were limited to the conjunctiva or superficial tissues.

6. Paragraph 9 of the Finding may be corrected to read as follows:

Because of the facts stated in paragraph 8, Dr. Breslin, on December 9, 1933, sent claimant to Dr. Boss, an eye specialist, at Springfield, Mass., whom he asked to make a thorough examination for the presence of any foreign matter therein which might offer occasion for claimant's complaints. Dr. Boss made a thorough examination of claimant's left eye, under magnification of the conjunctiva or superficial tissue and by means of an opthalmescope for the eye media inside of the eye, but found no foreign body nor any evidence of irritation or inflammation in the eye. He did find pallor in the optic nerve head to a degree that placed it on the border line between normal and abnormal limits. From this he en-

tertained a slight suspicion of a possibility that a neuritis of the optic nerve was developing.

7. Paragraph 10 of the Finding is corrected to read as follows:

Dr. Boss directed claimant to apply eye drops to his left eye, which he prescribed, which direction claimant followed. After his visit to Dr. Boss claimant continued to complain to Dr. Breslin about his left eye. The frequency of these complaints was the same as before Dr. Boss examined him and he said his eye felt as though there was something in it. He received no relief from the treatment prescribed by Dr. Boss and after six or seven weeks Dr. Breslin sent him to Dr. Boss again.

8. Paragraph 12 of the Finding is stricken out and the following substituted in place thereof:

On claimant's second visit to Dr. Boss on January 22, 1934, the latter, on opthalmoscopic examination, found that claimant's eye was distinctly abnormal in that the head of the optic nerve had developed a marked pallor; he concluded positively that a well developed neuritis of the optic nerve had occurred. On taking claimant's vision, Dr. Boss found that the left eye was reduced to 2/7 and the right, to 1/2 of normal.

9. Paragraph 13 of the Finding is corrected to read as follows:

Claimant continued to call daily on Dr. Breslin but received no relief from the treatment prescribed by the physicians. On April 14, 1934, claimant was examined by Dr. Walter L. Hogan of Hartford who found him to be suffering from an atrophy of the optic nerve of both eyes. Blood tests taken showed claimant to be suffering from syphilis. Syphilis is a frequent cause of atrophy of the optic nerves and believing that it was such in claimant's case, Dr. Hogan recommended that he submit to treatment for syphilis.

10. A paragraph to be known as 13A is to be added to the Finding to read as follows:

On July 7, 1934, claimant, after receiving treatment for syphilis from the Town of Thompsonville, was admitted to Hartford Hospital. It was there found that his syphilis was

a long standing and in a far advanced stage. He remained at Hartford Hospital until August 31, 1934, undergoing treatment for syphilis and after his discharge therefrom on that date returned at frequent intervals during a period of the two weeks next following, for anti-syphilitic injections. Later, claimant went to New York to St. Vincent's Hospital, and was examined by Dr. Gulliver of New York, an eye specialist.

11. Paragraph 14 of the Finding is corrected to read as follows:

Claimant's vision was not tested by either Dr. Breslin or Dr. Boss at any time after the accident up to January 22, 1934, at which date Dr. Boss examined it as stated in paragraph 12.